E-FILED
Wednesday, 24 December, 2025 12:00:45 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| **SANKOTY LODGE REAL ESTATE, LLC, KIM BLICKENSTAFF, KDB GROUP, LLC, SPRING BAY LAND DEVELOPMENT, LLC, SANKOTY LODGE, LLC, KIM BLICKENSTAFF REVOCABLE TRUST,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**MORTON COMMUNITY BANK, DWAYNE ATHERTON, PATRICIA ATHERTON, HERMAN BROTHERS POND MANAGEMENT, INC. HERMAN BROTHERS FISHERIES, INC., HERMAN BROTHERS CONSTRUCTION, GOOSE RANCH, LLC**<br><br>**Defendants.** | 25-cv-1520 |

## COMPLAINT

**NOW COME** the Plaintiffs, Sankoty Real Estate, LLC, Kim Blickenstaff, Sankoty Lodge, LLC, KDB Group, LLC, Spring Bay Land Development, LLC and Kim Blickenstaff Revocable Trust, by their undersigned attorneys, and complaining of Morton Community Bank ("Morton Bank" or the "Bank"), Dwayne Atherton ("Dwayne"), Patricia Atherton ("Patricia", together the "Athertons"), and the Herman Brothers Pond Management, Inc., Herman Brothers Fisheries, Inc., Herman Brothers Construction, and Goose Ranch LLC, states the following:

## NATURE OF ACTION

1.       This action arises from a multiyear scheme by a bank, its borrowers, and affiliated

vendors to fraudulently induce Plaintiffs to acquire Spring Bay Materials at an inflated price and, thereafter, to divert funds through false invoices, misrepresentations and various schemes and concealments, to steal physical assets, and continue to try to extort money. Plaintiffs assert common law claims (including tortious interference, nuisance, fraud, and conversion) and a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), seeking treble damages, attorneys' fees, injunctive relief, and declaratory relief.

2.      In 2019, Morton Bank was saddled with about $5.4 Million in bad loans it had made to the Athertons. The loans were all in default, and most of the fault was shared by the Bank and its customers, Patty and Dwayne Atherton. The Atherton's were bad business people and they could not be trusted.

3.      The Athertons started many businesses and, without exception, they all failed. Together with their partner, Clay Moushon, they created the Spring Bay Materials Company in or about 2012, which was literally a gravel pit. They now claim (and they told Mr. Blickenstaff) that their plan was to provide gravel for the construction of the new Caterpillar corporate headquarters in Peoria. However, their story is a fiction. Caterpillar did not announce its plans for its new headquarters to be built in Peoria until February 2015. And it cancelled these plans in 2017. Regardless, Caterpillar did not go through with their plans and instead first moved their headquarters to suburban Chicago in 2017 and later, in 2022, to Texas. So, as of 2019, the Athertons had an essentially worthless gravel pit business and they were saddled with $5.4 MM in bad debt.

4.      Morton Bank, with the knowing assistance of the Athertons and the Hermans, decided to solve its problem by defrauding a current bank customer into taking over the Atherton's bad loans by buying their failed gravel pit and securing them with not just the value of the property

2

being bought, but also including a personal guarantee. Kim Blickenstaff was that victim. And, once inside Mr. Blickenstaff's organization, they used their access to misappropriate money through a variety of schemes and devices.

5.      As more fully set forth below, Morton Bank, the Athertons and the Hermans lied to Mr. Blickenstaff, knowingly hid important material information about the Atherton's from him, sold Mr. Blickenstaff on the idea of a family fishing resort that was not-and could never be- the success that the Bank, the Atherton's and the Hermans touted to him and sold him on it with inflated, fictional projections. And they did so with the intention of convincing Mr. Blickenstaff to take over the Athertons' bad loans, including loans having nothing to do with the failed gravel pit business of Spring Bay Materials by building in goodwill based upon these fictional projections.

6.      Once they gained Mr. Blickenstaff's trust, the Athertons became a part of his organization and they used that access to misappropriate funds in a variety of clever and wrongful ways, as more fully set forth below.

7.      Mr. Blickenstaff trusted the Bank, the Athertons, and the Hermans and bought Spring Bay Materials at an inflated price which allowed the Bank to pay off all of the debt the Athertons owed on the company and in addition, paid off the Athertons other bad business loans that were completely unrelated to Spring Bay. By relying on the Bank, the Athertons and the Hermans, and by trusting what they told him, Mr. Blickenstaff now holds over $5.4 Million in bad debt the Bank handed off to him. By trusting the Bank, the Athertons and the Hermans, Mr. Blickenstaff had substantial amounts of money wrongfully taken from him and was persuaded to invest substantial money in projects that were doomed to failure from the outset but which enriched the Athertons and the Hermans.

8.      It is time the Bank, Dwayne and Patricia Atherton and the Herman Brothers are held responsible for their actions.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. §1331, based on the provisions of 18 U.S.C. Section 1964, the Racketeer Influenced and Corrupt Organizations Act ("RICO") of the Organized Crime Control Act of 1970, as amended. This Court has supplemental jurisdiction over plaintiff's common-law claims under 28 U.S.C. §1367(a).

10.     Venue is proper in this District under 28 U.S.C. §1391 (a), as substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information occurred within this District, and the property at issue is located in this District.

## PARTIES

11.     Plaintiff Kim Blickenstaff is an individual now residing in California. At relevant times he was a resident of Peoria County.

12.     Plaintiff Sankoty Lodge Real Estate, LLC is a limited liability company with its principal place of business in Peoria County, Illinois.

13.     Plaintiff Sankoty Lodge, LLC is a limited liability company its principal place of business in Peoria County, Illinois.

14.     Plaintiff, the Kim Blickenstaff Revocable Trust, is a trust created by Kim Blickenstaff.

15.     Plaintiff KDB Group, LLC is a domestic limited liability company with its principal place of business in Peoria County, Illinois.

16.     Plaintiff Spring Bay Land Development LLC is a limited liability company with its principal place of business in Peoria County, Illinois.

4

17.     Defendant Morton Community Bank is an Illinois state-chartered bank. It is a privately held corporation.

18.     Defendant Dwayne Atherton ("Dwayne") is a natural person residing in Spring Bay, Illinois.

19.     Defendant Patricia Atherton ("Patricia") is a natural person residing in Spring Bay, Illinois. Patricia is Dwayne's wife.

20.     Defendant Herman Brothers Fisheries, Inc. is a domestic corporation with its chief executive office located at 3004 North Taylor Road, Suite A, Hanna City, Illinois.

21.     Defendant Herman Brothers Pond Management is a domestic corporation with its chief executive office located at 8913 North Prairie Point in Canton, Illinois.

22.     Defendant Herman Brothers Construction is a domestic corporation with its chief executive office located at 8913 North Prairie Point in Canton, Illinois.

23.     Defendant Goose Ranch LLC is a domestic limited liability company located at 25369 North Goose Ranch Road, in Canton, Illinois.

## I.     FACTS APPLICABLE TO ALL COUNTS

### A.  THE BANK, THE ATHERTONS AND THE HERMANS CONSPIRE TO DEFRAUD MR. BLICKENSTAFF

24.     By 2019, Morton Community Bank was carrying approximately $5.3–5.4 million in nonperforming loans it had made to Dwayne and Patricia Atherton, including approximately $3.6 million associated with the Spring Bay Materials gravel operation and roughly $1.7 million in other business debt that was unrelated to Spring Bay Materials.

25.     The Athertons had started, or were a part of, the following businesses and all of them failed.

A.     PA Atherton Construction

      B.       Dairy Barn in Spring Bay
      C.       Gas Station in Bay View Gardens
      D.       Cross Fit East Peoria
      E.       Renew Crew
      F.       Leverage Media, LLC
      G.       DoMor
      H.       Leverage Media Firm, LLC
      I.       Atherton Services, LLC

26.     When they met Mr. Blickenstaff, the Athertons were deeply in debt. They owed Morton Bank about $1.7 MM for these failed businesses. They, along with their partner, Clay Moushon, owed Morton Bank $3.6 MM for the now failing gravel pit, Spring Bay Materials. They had no way to support themselves and no prospects for paying their debts. Moreover, they were in grave danger of being foreclosed upon by the Bank for all of their delinquent loans. Since the Bank had no great interest in owning a gravel pit and the Athertons did not want to suffer through foreclosure, they and the Bank were highly motivated to close. The threat of foreclosure was what added urgency to the Athertons desperate interest in closing the deal with Mr. Blickenstaff.

27.     With the knowing assistance of the Athertons, and later joined by the Hermans, Morton Bank worked out a scheme to unload all of the Athertons' bad loans on an unsuspecting victim who had the money to pay off all of these essentially worthless loans. All they had to do was dupe their victim into believing the Athertons were solid citizens and capable business people and that their largely worthless assets that the bad loans represented actually had some value and, even more important, a great deal of potential. In addition, by making themselves a part of the project, with the knowing assistance of the Bank, their scheme later gave the Athertons themselves direct access to Mr. Blickenstaff's money, property and assets.

28.     The Bank, the Athertons and the Hermans targeted Kim Blickenstaff. In 2017, Mr. Blickenstaff returned to his hometown area of Peoria, East Peoria and Spring Bay for his brother's funeral. This trip rekindled Mr. Blickenstaff's deep love for the place where he grew up. He started

spending more time there. When he retired from a very successful career in business in 2018, he returned to his hometown area of Peoria, Spring Bay and Peoria Heights. With nothing more than the area's best interests as inspiration, Kim decided to invest some of his wealth into various projects in and around the Peoria area for the benefit of the Peoria area and its citizens. As of 2019, he had invested a substantial amount of his own money: approximately $40,000,000. In addition, he borrowed about $5,329,750 from Morton Bank to invest in these various projects.

29.     Mr. Blickenstaff invested in the following projects, all of which were intended to improve the community. The amount of the loan is in parentheses. Many, but not all, of these projects were businesses and Mr. Blickenstaff was hopeful that he would be able to recoup his investments over time. However, the primary driver for these projects was Mr. Blickenstaff's desire to give back to the community that raised him. A short description of the nature and purpose of the project follows:

Peoria Heights:

A. The Atrium boutique hotel/Prospect Mall Project ($712,500) Mr. Blickenstaff's intent was to bring more commerce to the land locked Village of Peoria Heights. He sat down with the Mayor and they talked about how Mr. Blickenstaff could help the local economy and that this project would provide a place where paying guests could stay, and in the process provide jobs for locals, tax revenue for the Village, and improve a dilapidated building. Mr. Blickenstaff spent over $1M of his own money with Farnsworth Group, an architecture firm, to do the drawings for the boutique hotel.

B. The Save-a-Lot Grocery Store Project ($550,000): It was also intended to provide jobs, improve the building that housed the grocery store and would also include a coffee shop/deli for the trailhead, thereby contributing to economic growth of the Village.

C. The Hershel Building Project ($149,250) was also intended to contribute to local economic growth. Mr. Blickenstaff wanted to build a Bradley University museum in the space and include a small bar for revenue growth. Interestingly, once these plans were revealed, many local alums began donating their souvenirs from Bradley, including benches and wooden basketball planks from the old field house.

D. The Pabst Building ($ 2,817,500). After Mr. Blickenstaff bought the Atrium building and it was slated for renovations, there were many displaced businesses. To remedy this problem, Mr. Blickenstaff purchased the old Pabst Corporate building with the plan to provide leasable space to many tenants who wanted to stay in Peoria Heights.

E. The Grayboy Lofts Project ($262,500): This property in Peoria Heights was an eyesore in the center of town. Mr. Blickenstaff planned to build upscale housing above retail space, thereby improving the economy of the Village. There was a waiting list of people who wanted to live in these units and definite interested parties in the retail space.

F. The Subway Building ($450,000): the Subway Building was originally purchased to make way for the Grayboy Lofts Project, a planned residential and retail complex. The project did not proceed and the building was eventually sold.

G. Hazel House Project ($388,000): Mr. Blickenstaff purchased Bill Rutherford's home. Built in the 1960's, Bill and his wife Hazel were philanthropists in the Central IL area and Bill was Mr. Blickenstaff's mentor in his youth. Mr. Blickenstaff restored the home in honor of Bill, spending, in addition to the loan, more than $1M of his own money.

Spring Bay:

H. 1840 Ranch Project purchased by the Spring Bay Land Development LLC ($725,800): this is a part of the Sankoty Lakes project. This was a purchase of 191 acres with a homestead that was used as an "Airbnb" for the resort. Kim also purchased a 151 acre duck club for $537,825 for the guests to utilize.

30.    Based upon their knowledge of all the charitable and philanthropic acts noted above, which had received substantial media attention, and saddled with $5.3 MM in bad debt from the Atherton's Morton Bank loans (including Spring Bay Materials and other unrelated business loans), the Bank and the Athertons hit upon a scheme to mislead and defraud Mr. Kim Blickenstaff into taking over the Athertons' loans and securing them with both the real estate and, much more importantly, with a guarantee from Kim's personal trust. The Bank and the Athertons put their plan into motion.

31.    Key to their ability to sell Mr. Blickenstaff on the project and a role for the Athertons in the new enterprise was the Bank's and the Atherton's ability to sell Mr. Blickenstaff on the idea that the Athertons were honorable people and good, competent business people who

were victims of circumstances. This led to Dwayne's creation of the fictitious story about Caterpillar and its alleged commitment to buy huge amounts of sand and gravel for its planned new headquarters in downtown Peoria that it allegedly reneged on.

32.     This gave Dwayne an opportunity to discuss Dwayne's plans for his property. He started by "explaining" that the Caterpillar Peoria project that was supposedly the reason the Athertons had acquired the gravel pit had been abandoned and Dwayne's company, Spring Bay Materials, LLC, was in serious financial difficulty with no real prospects for emerging.

33.     The truth was not nearly so compelling nor did it make the Athertons appear to be innocent victims of Caterpillar's change of plans. VCNA Prairie Aggregates, LLC owned the gravel pit in 2013 even though it had not mined any gravel since 2006. It was in bad shape and had numerous environmental and zoning problems that had to be corrected and repaired before any gravel mining could happen. The truth was that when the Athertons purchased the company that owned the gravel pit in a deal that closed in December 2013, they did so because their construction company, P.A. Atherton, used a great deal of gravel and sand in its construction projects and the Athertons thought they could save money by owning a gravel source they could buy from. Caterpillar did not announce its intention to build its headquarters in downtown Peoria in 2012. That announcement was not made until 2015. The Athertons made plans to purchase the gravel pit in 2012 and closed on the purchase in 2013 with their then partner, Clay Moushon, primarily by financing it with Morton Bank. Mr. Moushon and the Athertons each agreed to post $2,250,000 in collateral to support the loans and each side would own 50% of the company. However, the Athertons later disclosed that they only had about $300,000 in real estate equity so Mr. Moushon was forced to post $4.2 MM of the collateral, that is, 93%. Even though they posted less than 7% of the collateral, they remained 50% owners with Mr. Moushon.

34.     Mr. Moushon was a lawyer with extensive experience in land use, zoning and environmental law. He agreed that for his part, he would clear up zoning and environmental issues and get all necessary permits. Patricia agreed to run the administration of the business and Dwayne agreed to manage the gravel operations.

35.     Even with a cheap source for gravel and sand, the Atherton's construction company, P.A. Atherton, was having financial difficulties in 2015-16. By late 2017, it could no longer meet its financial obligations to Morton Bank. In April, 2018, the Bank started liquidating P.A. Atherton assets to cover the construction company's bank debt.

36.     Mr. Moushon missed much of this drama as he was called up for active-duty military service starting in November 2016 and he served overseas until January 2018.

37.     The detailed, fabricated explanation offered to Mr. Blickenstaff as to why the Athertons found themselves in such dire financial distress served at least two purposes. First, it made them appear to be sympathetic victims of the whimsy of Caterpillar management. Second, it allowed the Athertons and the Bank to hide the fact that the Athertons were not the savvy, successful business people they held themselves out to be and as the bank represented them to be. In fact, they were unsuccessful in every business venture they owned and they were not trustworthy or honorable people. Because Mr. Moushon knew the truth about the Athertons as well as the gravel pit saga (both the real and the fabricated versions), the Bank and the Athertons kept Mr. Moushon and Mr. Blickenstaff apart. Mr. Blickenstaff was not even aware that Mr. Moushon had an interest in the gravel pit until they were preparing to close. When his interest was finally revealed, the Bank and the Athertons falsely blamed much of the failings of Spring Bay Materials on Mr. Moushon who continued to be kept away from Mr. Blickenstaff and his staff.

38.     Having set the stage, the Bank, the Hermans and the Athertons set their plan in

motion. Because he had been extensively featured in the local media, Mr. Blickenstaff's interest in conservation and outdoor recreation, particularly flyfishing, and his interest in supporting his community, brought him into contact with Dwayne Atherton. Dwayne finagled an introduction by Darin LaHood. Mr. LaHood was a lifelong Peoria resident who was then serving as the representative for District 16 in the United States House of Representatives.

39.     During an early conversation in 2019, Dwayne and Mr. Blickenstaff discussed Dwayne's various ideas for Spring Bay, Illinois, including building tiny homes for veterans, river front development, making improvements to the Spring Bay Marina, and starting a food bank for the church. They also generally discussed Mr. Blickenstaff's development plans for Peoria Heights. Based upon their discussions, Mr. Blickenstaff requested that Dwayne look for available properties in Spring Bay and begin looking at options and costs for tiny homes.

40.     Dwayne was aware that Mr. Blickenstaff was interested in fishing, particularly fly fishing. Using this as an introduction, Dwayne invited him to go fishing at the Herman Brothers' resort, Giant Goose Ranch, which was located in nearby Canton, Illinois. There, Dwayne introduced Mr. Blickenstaff to Nate Herman, one of the owners of Goose Ranch resort and also one of the owners of Herman Brothers Pond Management along with various other Herman Brothers businesses.

41.     The Canton trip was not successful and few fish were caught at the Hermans' Giant Goose Ranch Resort, and this was likely the planned outcome. Soon after the Canton trip, Dwayne invited Mr. Blickenstaff to fish on his property. Fishing was better at this property and Mr. Blickenstaff called Dwayne and asked Dwayne to join him. Over the course of the next several weeks, Mr. Blickenstaff and Dwayne, often joined by Nate Herman, fished together several times. Dwayne and Nate both professed an interest in learning to fly fish, and Mr. Blickenstaff was happy

to teach them.

42.    Nate and Dwayne were both aware that Mr. Blickenstaff had a vacation home in Montana that gave him access to trout fishing on nearby rivers. During one of their local fishing trips, Nate expressed the idea that, if a river was created on the Sankoty Lakes property that Dwayne owned, it could be a huge success as it would offer the excitement of flyfishing for trout in the Midwest that could not be found anywhere else. Not surprisingly, Nate Herman was very interested in being hired to create the river he was envisioning.

43.    This gave Dwayne an opportunity to discuss Dwayne's plans for his property. He started by "explaining" that the Caterpillar Peoria project that was supposedly the reason the Athertons had acquired the gravel pit had been abandoned and Dwayne's company, Spring Bay Materials, LLC, was in serious financial difficulty with no real prospects for emerging.

44.    While fishing on Dwayne's gravel pit property, Dwayne suggested to Mr. Blickenstaff that his property could be repurposed as an outdoor recreation facility for fishing, hunting, camping and other outdoor activities.

45.    After further discussion, Mr. Blickenstaff was convinced by Dwayne that the Spring Bay Materials Property was suitable for an outdoor recreation facility, and the two met several more times during the summer of 2019 to discuss Dwayne's ideas for the proposed facility.

46.    Dwayne first proposed to Mr. Blickenstaff that he provide the financing for the resort with Dwayne owning it and running it. Mr. Blickenstaff turned this proposal down, concluding that if he was going to finance it, he would like to own it. Dwayne moved forward with his next proposal.

47.    Next, Dwayne and the Hermans put together a proposal for the resort first named Spring Bay Sportsman Club, and next called Eichhorn Lakes Resort. After setting the stage for

Morton Bank, the Bank, the Athertons and the Hermans jointly made a proposal in July 2019. In this proposal, they pitched the idea of turning the gravel pit into a family resort offering swimming, boating, camping, meals out and, most important, exceptional fishing. This resonated with Mr. Blickenstaff who was an avid fisherman who wanted to bring exceptional fishing to the Peoria area because he knew the fishing in and around Peoria was poor.

48.    The Hermans prepared a pro forma in August 2019 that they used in the presentation to Mr. Blickenstaff. This pro forma was wildly inaccurate in that it materially underestimated the costs of construction and it wildly overstated the potential for revenue and profit. It underestimated construction costs by almost $6 MM and it overstated revenue and profits for the years 2020 to 2024 as follows:

A. 2020 Expenses Projected v Actual $392,000 v. $1,606,840
    Net Profit Projected v. Actual -$159,000 v. -$1,495.93

B. 2021 Expenses Projected v Actual $1,797,000 v $8,262,000
    Net Profit Projected v. Actual $73,000 v -$7,968,332

C. 2022 Expenses Projected v Actual $2,083,000 v $3,465,325
    Net Profit Projected v. Actual $184,000 v. -$3,101,481

D. 2023 Expenses Projected v Actual $2,342,000 v $785,684
    Net Profit Projected v Actual $757,500 v. $590,172

E. 2024 Expenses Projected v Actual $2,628,500 v $583,862
    Net Profit Projected v Actual $$800,500 v. -$226,019

Projections by their nature are rarely actionable. However, financial projections lose opinion protection when made without a reasonable factual foundation or in bad faith, as established in *Stransky v. Cummins Engine Co., Inc.,* 51 F.3d 1329 (7th Cir. 1995), as amended (Apr. 7, 1995). This case holds that "a projection can lead to liability under Rule 10b-5 only if it was not made in good faith or was made without reasonable basis." Id. at 1333 see also *United States Sec. & Exch.*

*Comm'n v. Ustian*, 16 C 3885, 2019 WL 7486835, at *30 (N.D. Ill. Dec. 13, 2019) ("an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct").

49.    Here, the projections were not made in good faith and were without a reasonable basis. They were made to induce Mr. Blickenstaff to proceed with the purchase of Spring Bay Materials to get the Athertons bad loans paid off and get the Bank off the hook for those bad loans.

50.    The Bank offered to sell Spring Bay Materials and Spring Bay Development to Mr. Blickenstaff and both the Bank, the Hermans and the Athertons represented to him that the properties were worth $5.3 MM. (Ex. 1, No. X) The various items of value were represented in the loan and sale documents by the Bank, the Hermans and the Athertons as follows:

Materials $50,000

Equipment $2,500,000

Land $980,000

Good Will $1,770,000

Total $5,300,000

51.    Each of these values was a fiction, entirely false and simply made up to fit the needs of the Bank, the Hermans and the Athertons. In truth and in fact, the purchase price was determined by needs of the Bank and the Athertons and did nothing more than represent the sum of what the Athertons owed the Bank for the now worthless gravel pit: $3,600,000 and other, unrelated bad debt of the Athertons for other failed businesses: $1,700,000. Contrary to what they told Mr. Blickenstaff, the loan was not the sum of the debt on Spring Bay Materials and Spring Bay development.

52.    The Bank also failed to inform Mr. Blickenstaff that the loan on Spring Bay Materials was delinquent and could have been foreclosed on by the Bank, but that would have greatly reduced the purchase price so the Bank omitted that material information. Later, Bob Dittmer from the Bank told Mr. Blickenstaff that because the Bank was not publicly owned, it could decide not to report nonperforming loans, even though the Athertons were over a year behind in their payments on Spring Bay Materials. Ditmer also told Mr. Blickenstaff that the reason the Bank had not declared the Athertons' loan in default was that they tried to work with good business people when they were having a tough time. This statement was false. In fact, the Atherton's had no ability to repay the loan and a sale would have netted the Bank substantially less than what the Atherton's owed. Moreover, the Athertons were not good business people. They had run literally every business venture they ever participated in into the ground and the Bank knew this as it held bad loans on many of the Athertons ventures.

53.    The proposal, with all of its misrepresentations and omissions, appealed to Mr. Blickenstaff and, when the dust settled, he had agreed to buy Spring Bay Materials by taking out a loan with Morton Bank loan for $5.3 MM thereby acquiring the gravel pit, all of its equipment and the nearby property that was now earmarked for development as a family resort. In so doing, he also paid off the Atherton's loan on Spring Bay Materials as well as all their other bad loans the Bank held.

54.    When all the parts were added up, the Bank offered Mr. Blickenstaff the gravel pit, the land immediately surrounding it, and the abandoned equipment for the price of $5.3 MM, which included $1.7 MM in goodwill, although the basis for the goodwill valuation has never been identified or described and was, in fact, a fiction. The goodwill was nothing more than the sum total of the Athertons' bad debt for other failed businesses and projects unrelated to the gravel pit

and held by the Bank. By taking over Spring Bay Materials for $5.3 MM, Mr. Blickenstaff also got the Athertons off the hook on their loan for Spring Bay Materials, and their other unrelated bad business debt, totaling $5.295 MM. What the Bank did not disclose to Mr. Blickenstaff was all of the following:

A.      Patricia had recently worked for a local bank, Alpha Bank in Spring Bay, IL but was separated from the bank for misappropriation of funds, according to the past Alpha Bank manager. It also failed to disclose that Alpha Bank had to clean up the loans. Patricia wrote in order to be in good standing for Morton Bank to acquire Alpha Bank.

B.      Dwayne's complete failure as a businessman. To the contrary, the Bank described Dwayne as an honorable, honest and capable businessman. The Bank failed to inform Mr. Blickenstaff that Dwayne had started and run many businesses into the ground. (See par. X, *infra.*)

C.      More to the point, the Bank failed to inform Mr. Blickenstaff that it had inflated the loan on the gravel pit so that it would cover both the amount due on the gravel pit as well as the other unrelated business loans that Dwayne had gotten from the Bank that were completely unrelated to the gravel pit or the resort. In fact, the value of the loan was not based upon the value of the land, the equipment and the business. The value of the loan was entirely a function of what the Athertons owed the bank and neither the Bank nor the Athertons chose to disclose this material information.

D.      Morton Bank had a recent appraisal (12/2018) of the gravel pit for just $3.26 MM. It withheld this information from Mr. Blickenstaff and did not disclose it until after the deal had closed.

E.    Morton Bank added $1.7 MM in goodwill to the value of the gravel pit, which had no prospects and no future as a gravel pit.

F.    The $1.7 MM in "good will" was arrived at because it was sufficient to cover the Athertons' other bad loans held by Morton Bank. Morton Bank did not disclose to Mr. Blickenstaff that the additional loan proceeds were intended to be used to retire the Atherton's' bad debt that was unrelated to the gravel pit and its business.

55.    The Bank did represent to Mr. Blickenstaff and his agents and representatives, both orally and in writing, that the Athertons were great people, hardworking, successful, trustworthy and on and on. (Ex. 1, No. X) The Athertons' undisclosed purpose for this introduction and the Bank's recommendation gave them an entrée into Sankoty Lodge. This in turn gave them access to the money and assets of Sankoty and Mr. Blickenstaff after Mr. Blickenstaff had acquired the property and started construction.

56.    Mr. Blickenstaff used his company, Sankoty Lodge LLC, to purchase the Sankoty Lakes project. After it was acquired, it was transferred to another business Mr. Blickenstaff owned: Sankoty Lodge Real Estate.

57.    Rather than simply secure the loan on the Sankoty Lakes project with the property covered by the loan, Morton Bank insisted upon additional security in the form of a guarantee by Mr. Blickenstaff's personal trust. The Bank did not make a similar demand for additional security when it loaned money to the Athertons. The only plausible reason for this additional security is that the Bank had no confidence in the value of the gravel pit, especially the good will, that it had ascribed to the gravel pit when trying to sell it to Mr. Blickenstaff.

58.    As more fully set forth below, the resort failed. It failed for many reasons. First, it was not worth anything near the value the Bank gave to it. Second, Dwayne Atherton, who was

hired by Mr. Blickenstaff's company KDB Group, was the Construction Manager for the resort

when it was in construction and development, used his proximity to the project's money and assets

to steal from Sankoty and Mr. Blickenstaff. Those efforts continue.

### B. CONSTRUCTION ON SANKOTY LAKES BEGINS

59.    The Sankoty Lodge loan closed in September 2019. Construction started in

November, 2019. Having worked his way into the Sankoty Resort inner circle, Dwayne became

an employee of KDB Group and was named Construction Manager. He assembled a crew and

oversaw their work. The Herman Brothers Construction Company, because of their extensive

experience in construction and in lake and river management and their relationship with Dwayne,

at the request of Dwayne were hired as consultants and paid $150 an hour.

60.    Soon after work began, the local construction union learned of the project and

threatened to picket the work and shut it down. KDB and its agents and representatives then learned

that the Athertons' construction company, PA Atherton, owed the union more than $200,000 in

unpaid union dues.

61.    To avoid this labor problem, Dwayne suggested to KDB Group that Herman

Brothers' Construction take over construction of the resort. The change was made in January 2020.

The Herman Brothers' first control of payroll was February 18, 2020. KDB Group paid the Herman

Brothers a General Contractor fee and they also billed KDB for construction materials,

subcontractors, leased equipment and payroll. After receiving the bill, KDB would then pay both

the General Contractor fee and the bills and Herman Brothers would take care of the payroll.

62.    Some months later, in September 2020, Jared Plattner, a Herman Brothers

employee, mistakenly sent KDB records that revealed two things that no one at KDB knew. First,

KDB learned that Dwayne was not only receiving his KDB Group payroll check as an employee

18

of KDB Group, he was also receiving secret, undisclosed cash payments that the Hermans included as an undisclosed item in their single aggregate bill to KDB Group. So, when the Hermans received this single payment, they were able to pay payroll and also make secret payments to Dwayne Atherton. This arrangement allowed him to secretly collect many thousands of dollars from the Herman Brothers which apparently was Dwayne's reward for getting the Herman Brothers the work. Second, KDB learned that the Herman Brothers were paying their construction workers in cash and not paying the Workers Compensation insurance.

63.    Work on the Pavillion, which was the resort building that housed the restaurant, bar, bathhouse and gift shop, was completed in March 2021. It opened later that same summer. In late summer 2021, KDB Group brought in Columbia Hospitality to run the resort and Columbia took over management of all employees. Since construction was completed, the construction crew was laid off in August 2021. In September 2021, Columbia offered Dwayne a position as Grounds Manager and Dwayne demanded that Columbia hire the Herman Brothers as well. Columbia declined and Dwayne declined Columbia's employment offer. In an attempt to force Columbia to hire the Herman Brothers, Dwayne threatened to burn Sankoty down, as related by two Columbia employees: Ryuan Grey and Roger Keeton. KDB Group then eliminated the Construction Manager position as construction had ended, ending Dwayne's employment with KDB Group.

64.    The resort was listed for sale in June 2023. Finding no takers, it was leased with an option to purchase on April 6, 2025. The tenants are Sand Springs Retreat, LLC. They opened the resort in May 2025. As more fully set forth below, Dwayne and his accomplices have acted tirelessly to disrupt the operation of the resort in an attempt to extort payments from Mr. Blickenstaff.

65.     Dwayne and other members of his family own the four parcels of land that border the Sankoty property that Mr. Blickenstaff purchased. Each of the four parcels is about ten acres. Dwayne and others have used this proximity to try to disrupt Sankoty's operations. Taking advantage of their access to Sankoty and its guests, they have, for example, placed unsightly equipment on the beach adjoining the Sankoty Resort property; they have dumped land materials into the lake; they have shot fireworks over the guests at the restaurant; they have burned massive bonfires on the hillside; they have found other ways to disrupt the guests' peaceful enjoyment of the resort. The tenants are not making a profit and threatening to break the lease.

### C.  ALL THE OCCASIONS THAT THE ATHERTONS AND THE HERMANS TOOK ADVANTAGE OF THEIR POSITIONS TO HELP THEMSELVES TO KDB'S CASH AND OTHER ASSETS

66.     As more fully set forth in paragraphs 59-60 above, Dwayne used his position as Construction Manager for the resort's construction to arrange for the Hermans to handle payroll. The Hermans did so by giving KDB Group a bill for all labor, services and materials to the Resort and being paid a lump sum. Unknown to the Resort and the Plaintiffs, this allowed the Hermans to avoid paying Workmen's Comp Insurance. It also allowed the Hermans to secretly kick back regular payments to Dwayne for getting them the job.

67.     After the end of the construction phase of Sankoty Lakes, after Dwayne declined the employment offer by Columbia Hospitality and his role with KDB Group was eliminated and he was ousted from the resort, Dwyane started a campaign to try to force the Plaintiffs to pay him to go away. He and his wife Patricia filed a lawsuit in October 2022 and are now trying to use that suit, coupled with their actions below, to coerce a settlement from the Plaintiffs here in their currently pending lawsuit. They are attempting to do so as follows.

68.    Dwayne is the fee simple title holder of the neighboring property commonly known as 96 Eichhorn Road, Spring Bay, Illinois (hereafter referred to as "96 Eichhorn") located in Woodford County, Illinois. This is important because at the orientation of the Sankoty Lodge LLC purchase, Mr. Blickenstaff and his staff were led to believe that the 96 Eichhorn property was included in the purchase. The initial drawings of the resort done by Giant Goose Ranch included this parcel as this is where the 7 story lodge was to be built. That is to say, the original drawings, done by the Herman Brothers Construction Company, put the Sankoty Lodge on Atherton property. It is inconceivable that the Hermans and Dwayne Atherton did not know that they were planning to build a Sankoty Lodge on Atherton property. This plan did not come to light until after Dwayne was terminated and a surveyor was brought in. During construction of Sankoty Lakes, the trout stream headwaters were partially built on this property along with a large concrete wall, a portion of the beach and shoreline, and the landscaping of the hillside. Dwayne and the Hermans completed this construction knowing that the work was being completed on Dwayne's property. Dwayne held this deceit in his pocket until he decided to reveal the true property line in October 2021 in order to use it as leverage to force a payment to him from Plaintiffs.

69.    As more fully set forth above, Sankoty Resort is a commercial property designed and developed as a family-friendly outdoor recreation facility for outdoor usage including hiking, camping, swimming, fishing and boating. Consistent with this plan, Sankoty Resort contains many amenities, including a restaurant and commercial camping lots and tents for rent.

70.    Key to the design and operation of Sankoty Resort is the aesthetic beauty and serene tranquility of the natural setting which includes a swimming beach, running streams and undisturbed forestry. As more fully set forth above, in 2023, Sankoty Lodge, L.L.C. closed down

Sankoty Resort. Since that time, it has actively sought to sell or lease Sankoty Resort to potential buyers looking to operate the outdoor recreation facility.

71.    In late 2024, KKR Hotel, a prospective purchaser, (later known as Sand Spring Retreat, LLC) began conducting onsite inspections of Sankoty Resort for the purpose of evaluating the property for feasibility of operating its own family friendly outdoor recreational facility.

72.    KKR Hotel conducted several onsite visits to Sankoty Resort on the following dates: December 4, 2024; March 17, 2025; April 1, 2025; April 3, 2025; April 4, 2025.

73.    On or about February 1, 2023, Dwayne filed his First Amended Complaint in Woodford County Case No. 22-LA-15 ("Original Lawsuit").  In that suit, he and his wife Patricia allege various causes of action seeking monetary damages from the Plaintiffs based on their alleged claims of ownership and compensation owed to them for the design and construction of Sankoty Resort.

74.    Dwayne was an employee of KDB Group from 2019 to 2021 and has direct personal knowledge of the critical importance that aesthetic natural beauty has to the purpose and value to Sankoty Resort.

75.    Dwayne specifically alleges throughout his First Amended Complaint that he was primarily responsible for the design, development and construction of Sankoty Resort. Indeed, he further alleges that he should be deemed a partner to the business that runs Sankoty Resort and that he is entitled to a 1/3 ownership interest.

76.    So, Dwayne was well aware of the recreational purpose and commercial nature of Sankoty Resort as well as the importance of its natural beauty and tranquil setting.

77.    On or about February 21, 2025, Dwayne deliberately collected and stored many unsightly and deteriorating items along the border of the respective properties on the beachfront

of 96 Eichhorn, along the property line. These eyesores included an abandoned 25-foot camper with a 10-year expired registration sticker, and a large, unused, rusted grain bin. On or about March 30, 2025, Defendant placed an unused and abandoned jet ski on the beach. On or about April 1, 2025, Defendant placed jon boats on the beach and hillside and placed a large blue drainage culvert near trout stream head.

78.    On or about February 28, 2025, Defendant placed rope and "No Trespassing" signs along the property line. Dwayne and the Hermans secretly kept quiet their knowledge that Sankoty Lakes was built on Dwayne's property for the very reason to use this property line to harass, disrupt, and wreak havoc on the Plaintiffs' ability to conduct business at Sankoty Lakes Resort.

79.     In addition to the junk placed on and near the beach area, Dwayne placed unused construction materials on the hillside of Sankoty Resort, in ever increasing quantities from April through present.

80.    On April 9, 2025, former counsel for the Plaintiffs attended the monthly Village of Spring Bay Board Meeting to disclose that Dwayne had dumped all the junk described above, and requested the Village Mayor and Board to enforce its ordinances mandating that Dwayne remove the junk.

81.    On or about April 13, 2025, Dwayne deliberately made his unsightly mess much worse by allowing two (2) unidentified persons to spray paint red and black graffiti on the side of the inoperable camper and rusted grain bin that they put up to face the Sankoty Resort property. The culprits spray painted several depictions of the male anatomy, as well as letters that appear to be "FAFO".

82.    On that same day, Dwayne and his accomplices also placed unused couches, tables and chairs, rusted appliances, construction debris, and discarded household waste on the beach and

hillside. Attached hereto and incorporated herein are copies of photographs of the Junk on various dates.

83.    The April 13, 2025 dump of additional junk had two purposes. First, it was in retaliation for Plaintiffs' former counsel complaining to the Village of Spring Bay. Second, it was intended to make the unsightly mess even more unsightly and to thereby increase the pressure on Plaintiffs.

84.    On or about April 19, 2025, Defendant started a fire on the hillside. Predictably (and as intended), the fire released voluminous, noxious black smoke.

85.    On or about May 6, 2025, Plaintiffs' former counsel had a phone call with Dwayne's attorney, Mark Walton and complained about the junk his client had dumped on the Resort's property line. He then requested that it all be removed. Dwayne's attorney confirmed that he would ask his client to remove the junk.

86.    On or about May 6, 2025, Dwayne did in fact move the camper and the rusted grain bin. But he only moved them about 20 feet from the property line boundary. That is to say, he left them both on the beachfront and in full view by the Resort and its guests. Dwayne did have the camper painted white to remove the graffiti.

87.    The majority of the junk therefore remains on the 96 Eichhorn property plainly visible to anyone visiting Sankoty Resort.

88.    Plaintiffs have made multiple requests to Dwayne to remove his junk, but Dwayne refuses to take action to remove any of his Junk.

89.    These items are plainly and deliberately visible from Plaintiffs' resort property and they intentionally create unsightly, offensive and hazardous conditions for the owners, tenants and visitors of Sankoty Resort.

90.    The tenants visited with the Mayor and Village representative during a discussion regarding permitting for the operation of the resort. During this meeting the Village Representative told the tenants that "one phone call from Mr. Blickenstaff to Dwayne could make all this go away."

### COUNT I AGAINST DWAYNE AND PATRICIA ATHERTON
(Tortious Interference with Business Expectancy of Sankoty Lodge)

91.    Plaintiffs had a reasonable business expectancy in leasing, selling, and operating the Sankoty resort, including negotiations with prospective counterparties (e.g., Sand Spring Retreat, and multiple restaurant operators).

92.    There is reasonable expectation that Plaintiffs would enter into valid business agreements to sell, rent and/or manage the business and real estate located at Sankoty Resort.

93.    Dwayne and Patricia had knowledge of Plaintiffs' business expectancy; Dwayne and Patricia were aware of the potential for a buyer or tenant.

94.    Dwayne's actions have intentionally and unjustifiably interfered with the Plaintiff's business expectancy by directly engaging in conduct that detrimentally affects Plaintiffs, its tenant, and their visitor's use, enjoyment and aesthetic appearance of Sankoty Resort.

95.    The interference is physically offensive and creates a visual blight. Plaintiffs continue to suffer irreparable harm due to Dwayne's ongoing conduct, including loss of enjoyment of the property and continued interference with potential buyers, renters and / or operators of Sankoty Resort.

96.    Plaintiffs suffered damages including lost opportunities and reputational harm, and injunctive relief is warranted.

97.    Plaintiffs have no adequate remedy at law, as monetary damages cannot fully compensate for the ongoing harm to the use and enjoyment of Sankoty Resort.

98.    Dwayne's conduct is not justified by any legal right or necessity. The deliberate harm he inflicted on the Plaintiffs from the continued exposure to Plaintiffs, their potential business partners and their guests because of the presence of the unsightly and offensive junk Dwayne has chosen to place near their shared property line outweighs any inconvenience to Dwayne and Patricia from removing the junk.

99.    An injunction will preserve the status quo and prevent further harm while the case is adjudicated.

WHEREFORE, Plaintiff, SANKOTY LODGE REAL ESTATE, L.L.C., respectfully requests that this Honorable Court grant the following relief:

A.  Issue an Injunction enjoining Defendants from maintaining unsightly, offensive, and hazardous items in plain view on near the property line;

B.  Order Defendants to remove or adequately screen the items from public and neighboring view within a reasonable time; Grant such other and further relief as this Court deems just and proper.

### COUNT II AGAINST DWAYNE AND PATRICIA ATHERTON
(Tortious Interference with Business Contract of Sankoty Lodge)

100.    Plaintiffs repeat and reallege paragraphs 1 through 99 as though fully set forth herein.

101.    Following months of negotiation, Plaintiffs entered into a contract with Sand Springs Retreat LLC to lease the Sankoty Resort from Plaintiffs.

102.    Defendant's wife, Patricia was present at the Village of Spring Bay Board meeting on April 9, 2025, at which time, Plaintiff's former counsel sought the Village's assistance in having the unsightly and hazardous items removed from Defendant's property. See par. 78, *supra.*

103.    At the meeting, Plaintiffs' counsel informed all those in attendance, including Patricia, of the lease agreement between Plaintiff and Sand Springs Retreat LLC.

104.    Representatives of Sand Springs Retreat LLC also met with the Mayor of the Village of Spring Bay and requested that he and the Board assist with the cleanup of the junk.

105.    Defendants Dwayne and Patricia were therefore well aware of the contractual relationship between Plaintiff and Sand Springs Retreat LLC. Despite such knowledge, Dwayne and Patricia doubled down on their wrongful acts by placing additional junk on the boundary line they shared with the Resort and refused to remove any of the junk they had placed there.

106.    Dwayne and Patricia's intentional and unjustifiable actions to further cause unsightly and hazardous conditions to the boundary of Sankoty Resort was done with the intent to induce a breach of contract between the Plaintiff and Sand Springs Retreat LLC.

107.    Their intentional and unjustifiable actions to maintain the unsightly and hazardous conditions at the boundary of Sankoty Resort was, and continues to be, a malicious attempt to intimidate Plaintiff, Sand Springs Retreat LLC and its guests.

108.    Beginning in early May 2025, Sand Springs Retreat LLC interviewed three potential restaurant operators for the lakeside restaurant. All three of the potential restaurant operators rejected Sand Springs Retreat LLC and did so because of the unsightly pile of junk placed by Dwayne and Patricia on the property line.

109.    Defendants' actions therefore directly prevented the Sand Springs Retreat LLC from retaining a restaurant operator.

110.    As Dwayne and Patricia well know, the lakeside restaurant serves as an integral part of Sankoty Resort as a draw for visitors for its operations, and as a revenue source.

111.    In support hereof, and incorporated herein is Exhibit 1 which lists many of the offensive and extortionist acts taken by the Defendants and confirming the facts set forth herein.

WHEREFORE, Plaintiff, SANKOTY LODGE REAL ESTATE, L.L.C., respectfully requests that this Honorable Court grant the following relief:

A.  Order Defendant to remove or adequately screen the items from public and neighboring view within a reasonable time;

B.  Grant such other and further relief as this Court deems just and proper.

### COUNT III AGAINST DWAYNE AND PATRICIA ATHERTON
(Private Nuisance of Sankoty Lodge)

112.    Plaintiffs repeat and reallege paragraphs 1 through 111 as though fully set forth herein.

113.    The junk deliberately placed on the Resort's property line by Dwayne is plainly visible to the patrons of Sankoty Resort and create unsightly, offensive and hazardous conditions.

114.    This interference is physically offensive and creates a visual blight. Dwayne's conduct is (i) intentional in that he knowingly maintained the condition despite repeated complaints, or, alternatively, is (ii) negligent in that he failed to exercise reasonable care in failing to avoid a private nuisance.

115.    Plaintiffs continue to suffer irreparable harm due to the ongoing nuisance, including loss of enjoyment of the property by tenants and guests. There have been guest complaints of nuisances, harassments and confrontations by Dwayne and his accomplices.

116.    Plaintiffs have no adequate remedy at law, as monetary damages cannot fully compensate for the ongoing harm to the use and enjoyment of the property.

117.    Plaintiffs have a strong likelihood of success on the merits of its private nuisance claim, which is supported by photographic evidence, witness testimony, and municipal code violations.

118.    Dwayne's conduct is not justified by any legal right or necessity. The harm to Plaintiffs from continued exposure to the unsightly and offensive conditions outweighs: (i) any inconvenience to Dwayne and Patricia from removing their junk, or (ii) any right Dwayne and Patricia have to litter their property with junk, particularly the inoperable camper, abandoned jet ski and rusted grain bin.

119.    Dwayne's placement of the Junk on the beach and hillside serves no purpose other than to create havoc, annoyance, nuisance and otherwise extract funds from Plaintiffs.

120.    An emergency injunction will preserve the status quo and prevent further harm while the case is adjudicated.

WHEREFORE, Plaintiff, SANKOTY LODGE REAL ESTATE, L.L.C., respectfully requests that this Honorable Court grant the following relief:

A. Order Defendant to remove or adequately screen the items from public and neighboring view within a reasonable time;

B. Grant such other and further relief as this Court deems just and proper.

### Count IV – FRAUD
**Against Morton Bank, Dwayne Atherton, Patricia Atherton and the Herman Brothers for the Scheme to Sell Mr. Blickenstaff the SBM Property and Spring Bay Development at an Inflated Price**

121.    Plaintiffs repeat and reallege paragraphs 1-120 as though fully set forth herein.

122.    Morton Bank, Dwayne and Patricia Atherton and the Herman Brothers joined forces and conspired to fraudulently induce Mr. Blickenstaff to buy the gravel pit for far more than

it was worth and for the purpose of paying off the Athertons' bad loans, many of which were entirely unrelated to the gravel pit.

123.    In order to induce Mr. Blickenstaff to buy the gravel pit, they made the following misstatements and/or omissions of material fact;

A.    Dwayne and Patricia both falsely explained that their company, Spring Bay Materials had originally been purchased to provide Caterpillar with sand and gravel for its new headquarters in downtown Peoria. This was a lie. Caterpillar announced the project long after Dwayne and Patricia, with their partner, Clay Moushon, had acquired Spring Bay Materials for the purpose of supplying sand and gravel cheaply to the Athertons construction company.

B.    Dwayne and Patricia also explained that their Spring Bay Materials company failed because Caterpillar suddenly, and without warning, cancelled their plans. This was also false, Spring Bay Materials failed because the Athertons were and are notoriously bad at running a business.

C.    The effect of the false narrative about Caterpillar served two purposes. It allowed Dwayne and Patricia to portray themselves as sympathetic, hapless victims. This also allowed them to hide their incompetence.

D.    Morton Bank assisted in this ruse. Morton Bank repeated both the false story of Caterpillar's betrayal and the equally false story that the Athertons were honest, capable business people. Morton Bank also conspired to keep Clay Moushon away from Mr. Blickenstaff and his representative to keep the truth about the Athertons away from them.

E.    Dwayne (with the help of the Herman Brothers), knowing that Mr. Blickenstaff was an avid outdoorsman and ardent fly fisherman, then pitched the idea to Mr. Blickenstaff that they

could repurpose the Spring Bay Materials property and develop it into what the Hermans described as a "world-class" family resort.

124.    The Bank omitted the following material information in its discussions with Mr. Blickenstaff which the many misrepresentations it made obligated it to disclose. The Bank set the price of Spring Bay Materials at $5.3 MM.  The price was set with little regard to the actual value of SBM. Rather, the price reflected how much the Athertons owed the Bank for both their SBM loans (which were then in default) and their other bad business loans held by the bank.

125.    As more fully set forth in paragraphs 45 and 46, the Bank and the Athertons and the Herman Brothers jointly pitched the idea of a resort that could be built on Spring Bay Materials property at a presentation at Morton Bank offices.

126.    The Bank also failed to disclose that it had a recent appraisal for Spring Bay Materials for $3.4 MM, almost two million dollars less than the price they sold Spring Bay Materials to Mr. Blickenstaff.

127.    The Bank added $1.7 MM for goodwill even though Spring Bay Materials was a failed business with no hope of recovery and no basis for goodwill existed. It did however cover (almost exactly) the amount of the Athertons' bad business loans unrelated to Spring Bay Materials that the Bank held.

128.    The Bank and the Athertons kept the Athertons partner in Spring Bay Materials, Clay Moushon, away from them. They refused to divulge his identity until shortly before closing and always suggested that he was another reason the Spring Bay Materials business failed.

129.    The Athertons, the Bank and the Herman Brothers knew that they were making false statements to Mr. Blickenstaff about the value of the Spring Bay Materials property and equipment as well as the cost of developing it and the financial potential it had.

130.    Mr. Blickenstaff trusted them and believed them and relied on what he was told.

131.    Mr. Blickenstaff purchased the Spring Bay Materials property at a price inflated by almost $2 MM and did so in order to develop the property at a price that was wildly underestimated. Mr. Blickenstaff thereby suffered damages as a result of their fraudulent statements and omissions.

WHEREFORE, all Plaintiffs respectfully request that this Honorable Court grant the following relief:

A.  Award Plaintiffs their damages in an amount to be proven at trial;

B.  Award Plaintiffs their costs and reasonable attorneys' fees;

C.  Award Plaintiffs punitive damages in an amount three times their actual damages

D. Grant such other and further relief as this Court deems just and proper.

## COUNT V
## CIVIL THEFT AND UNJUST ENRICHMENT AGAINST BY ALL PLAINTIFFS
### Against Dwayne Atherton

132.    Plaintiffs repeat and reallege paragraphs 1-131 as though fully set forth herein.

133.    Dwayne used his position as Construction Manager to steer the construction work to his co-conspirator, the Herman Brothers. With his access to Mr. Blickenstaff's operation, he directed KDB Group to pay the Herman Brother's regular lump sum bills covering goods, services and labor to give the Herman Brothers enough money that they could kick back secret payments to Dwayne every pay period.

134.    It also allowed the Herman Brothers to avoid paying Workers Comp insurance.

135.    These efforts continue. Dwayne has filed a spurious suit claiming that Mr. Blickenstaff promised him a 1/3 partnership interest in Sankoty even though there are no writings anywhere that substantiate this spurious claim.

136.    Dwayne also now claims that he is owed substantial sums for the fair market rental value of the equipment and tools from Spring Bay Materials that he left behind even though the purchase documents all make clear that Plaintiffs were purchasing Spring Bay Materials equipment and tools for $2.5 MM. Dwayne is trying to take advantage of his own failure to provide a list of tools and equipment that were included in the sale and now he claims they were not.

137.    Dwayne and his wife Patricia are also now claiming that they are owed $2.5 MM for the value of the sand and gravel they took from their own property and used in the construction of Sankoty and various related projects around it. This claim is specious for two separate and independent reasons.

A.    First, Dwayne misled Mr. Blickenstaff and his staff into believing that the sand and gravel being used was in fact coming from the property that Mr. Blickenstaff had just purchased. Dwayne was able to do this by using misleading maps of the area that did not accurately show the property lines between his property and Sankoty's.

B.    Second, as the construction manager, Dwayne knew or recklessly failed to know that the gravel and sand that was being used was coming from property he and Patricia owned and not from Sankoty owned property. Dwayne also knew that comparable sand and gravel were available for the project from land owned by Sankoty and therefore, there was no need for him to use material from his own property unless his plan was to later make a claim for it.

C.    The claim also fails for the reason that the Athertons valued this property at $50,000 in Patricia's bankruptcy proceedings. Patricia held title to the property, but only after Dwayne transferred his interest to her for no consideration, that is, for nothing. Patricia then took the position in her bankruptcy filings that the property had no value because of the amount of debt on it. To settle the trustee's claim of fraud, Dwayne paid $50,000 for the property. Now, he and his

wife are claiming that they are owed $2.5 MM for the sand and gravel that Dwayne used in the Sankoty construction.

138.    Dwayne has stolen a 2020 Ford 250 pickup truck (the "Truck") from Sankoty.

    A.  In 2020, KDB Group leased the Truck. At the time, Dwayne was a KDB Group employee and he had permission to use the Truck for work.

    B.  KDB group made the payments for the lease and the insurance. Per the insurance, only KDB Group employees could drive the Truck.

    C.  Dwayne was terminated in September 2021. His termination notice specified that the Truck was to be returned.

    D.  In July 2022, the Truck still had not been returned. At that time, KDB Group directed its lawyer to make a demand for the return of the Truck.

    E.  Rather than return the Truck, Dwayne hid it. His lawyer now contends that Dwayne does not have the Truck. So, he either gave it away, sold it or is still using it. Regardless, he stole the truck from KDB Group.

WHEREFORE, all Plaintiffs respectfully request that this Honorable Court grant them the following relief against Dwayne Atherton:

    A.  Award Plaintiffs their damages in an amount to be proven at trial;

    B.  Award Plaintiffs their costs and reasonable attorneys' fees;

    C.  Award Plaintiffs punitive damages in an amount three times their actual damages

    D.  Grant such other and further relief as this Court deems just and proper.

**COUNT VII — CIVIL RICO (18 U.S.C. § 1962(c)) (Against Morton Community Bank, Dwayne Atherton, Patricia Atherton, and the Herman Entities)**

139.    Plaintiffs reallege and incorporate paragraphs 1-138 as if fully set forth herein, and attached hereto as Exhibit 1 (Predicate Acts Chart) and incorporated herein. Exhibit 1 identifies

with particularity the mail and wire communications constituting predicate acts of racketeering (18 U.S.C. §§ 1341, 1343) and the criminal acts of extortion.

### RICO PERSONS

140.    Each Defendant named in this Count is a 'person' within the meaning of 18 U.S.C. § 1961(3), including: Morton Community Bank; Dwayne Atherton; Patricia Atherton; Herman Brothers Pond Management, Inc., Herman Brothers Fisheries, Inc., Herman Brothers Construction, and Goose Ranch LLC, (collectively, the 'Herman Entities').

### THE ENTERPRISE (ASSOCIATION-IN-FACT)

141.    The 'Sankoty Scheme Enterprise' is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), consisting of Morton Community Bank (acting through its senior officers and employees), Dwayne and Patricia Atherton, and the Herman Entities and their principals, which together formed an ongoing organization with a common purpose, relationships among those associated with it, and sufficient longevity to pursue its purpose.

142.    The common purpose of the Enterprise was to obtain Plaintiffs' money and property by: (a), first inducing Plaintiffs to acquire Spring Bay Materials at an inflated price that concealed a lower appraisal and the payoff of unrelated Atherton debts, and (b) thereafter, by diverting construction funds by false invoices, concealments, and undisclosed cash payments. After Plaintiffs acquired the property, the Athertons and the Hermans took many steps to maintain their relationship with the Plaintiffs and their connection to the project so they could continue to steal money and extort money. For example, they took the following actions:

A.    The Hermans persuaded Plaintiffs to engage in a construction plan to (1), create a trout stream and (2) build a fish hatchery. This allowed the Hermans to then secure the construction for both the stream and the hatchery ponds and get paid for both. But the Hermans were only able

to do this by materially understating the anticipated costs and by ignoring that the physical environment for both the stream and the hatchery ponds was completely unsuited for their respective purposes. It also ignored that the costs of building the hatchery far exceeded the cost of simply buying immature fish from established hatcheries.

B.     The Athertons and the Hermans persuaded Plaintiffs to pursue water remediation credits for the property the Plaintiff purchased. They first inflated the potential value of the credits to $5.3 MM as a further inducement to get Plaintiffs to buy additional property. Dwayne conveyed that he was knowledgeable about remediation credits. The Plaintiff hired Nate Parrott, PAL at Midwest Engineering, to submit remediation credit application. After months of delay, Nate Parrott communicated that the property did not in fact qualify for remediation credits. Once again, Dwayne Atherton misrepresented the knowledge he had on the subject, made false promises to the Plaintiff that money would come from remediation credits all for the benefit of the Atherton's to have more land acquired for the purpose of hunting and fishing for themselves.

C.     Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity. The Bank's officers decided what to conceal and communicated the closing price and terms; the Athertons orchestrated the sales narrative, managed communications, and, after closing, leveraged access to KDB Group payments; and the Herman Entities prepared and submitted invoices and received wires while paying undisclosed cash to Dwayne Atherton.

D.     The Athertons and the Hermans misled Plaintiffs into hiring them to construct the trout stream and fish hatchery. Construction on the hatchery was stopped in August 2021 when it became clear that it would cost more to breed and raise fish than to buy young fish outright. But this decision was only made after $500,000 was spent on the hatchery. In September 2021, the

Plaintiff hired an expert to evaluate the viability of a successful hatchery on the premises. This expert evaluated the design of the hatchery and recommended that the project come to a halt primarily due to the lack of adequate water quality, the design of the hatchery, and the $500,000 per year costs verse much lower cost of purchasing stock fish for the property. While construction on the trout stream was completed in 2021, it came with a multitude of flaws and challenges. Designed and constructed by Athertons and Hermans, the trout stream was plagued with fish kills, uncontrollable algae blooms, poor water quality and inadequate temperatures to provide a viable habitat for trout. The Plaintiffs hired an expert stream ecologist to evaluate the design and operations of the trout stream, and he provided an analysis in November 2021. The Athertons and Herman's poor design has led to thousands of dollars spent attempting to correct the inadequate design and these expenditures will be ongoing. Ironically, the Athertons have filed a preliminary injunction to have the stream pumps turned off with a claim of erosion on the lake bank where the water re-enters the lake after being pumped from the lake into the stream. This is the very stream that the Atherton's and Hermans designed. The flowing trout stream provided an aesthetic delight to the resort guests. It is now a stagnant, overgrown, weed stream that will take many thousands of dollars to clean-up.

E.      After he was removed from his job at Sankoty, Dwayne Atherton made garbage displays along the shared property line. He did this for several reasons. One, it discouraged new restaurant operators from leasing the restaurant at the lodge. Two, it spoiled the views and therefore interfered with the Lodges paying guests' experience at the Lodge and discouraged other customers from coming. Three, it was intended to frighten the Lodge's management and owner as they frequently stated Dwayne had large, uncontrolled fires late at night.

F.      Relationships/roles: the Bank's officers set and presented the inflated price and

controlled what was disclosed; the Athertons created and delivered the false narrative and controlled vendor selection; the Herman Entities generated budgets and invoices, received wires, and made concealed cash payments to D. Atherton while avoiding statutory obligations; all coordinated to consummate and profit from the scheme.

G.      Longevity: the Enterprise operated continuously from at least mid-2019 through at least late 2021, spanning the sale/closing (September 2019), engagement of Herman Entities (late 2019), multiple wire payments (February 2020 forward), and concealment efforts (including September 2020 email disclosures). It continues to this day, as the Athertons continue to try to force payments from the Plaintiffs by piling garbage along their shared property lines and starting huge fires at night.

### CONDUCT OF THE ENTERPRISE'S AFFAIRS

143.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity. The Bank's officers decided what to conceal and communicated the closing price and terms; the Athertons orchestrated the sales narrative, managed communications, and, after closing, leveraged access to KDB Group payments; and the Herman Entities prepared and submitted invoices and received wires while paying undisclosed cash to D. Atherton.

### RACKETEERING ACTIVITY & PREDICATE ACTS

144.    Defendants engaged in racketeering activity, consisting of mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343) and extortion (18 U.S.C. §1951.) The specific communications and acts are identified in Exhibit 1 Predicate Acts, and are incorporated herein by reference. By way of example and without limitation:

A.      On or about September 2019, the Bank transmitted loan/closing materials via

overnight delivery and/or email to Plaintiffs, pricing Spring Bay Materials at approximately $5.3 million including a $1.7 million 'goodwill' component while omitting a then   recent December 2018 appraisal valuing the asset near $3.4 million and omitting that additional proceeds would retire unrelated Atherton debts.

B.     On February 18, 2020, KDB Group wired funds to a Herman Entity pursuant to invoice(s) that misstated labor and materials and concealed undisclosed cash payments to Dwayne Atherton and noncompliance with workers' compensation

C.     In September 2020, a Herman Entity (via its employee, Jared Plattner) emailed internal payroll/ledger documents evidencing undisclosed cash payments to Dwayne Atherton and lack of workers' compensation coverage (See Exhibit 1), corroborating prior misrepresentations used to obtain KDB Group payments.

Each predicate act identifies the 'who, what, when, where, and how' and how the communication furthered the scheme. Plaintiffs attach true and correct copies (or identify by exhibit) of the communications supporting each predicate.

### PATTERN AND CONTINUITY

145.     The predicate acts are related in purpose, participants, victims, and methods, and amount to or pose a threat of continued criminal activity. The acts span at least from mid-2019 through late  2021 and into the current date, and, at the time they were committed, carried an open-ended threat of continued diversion of funds through further invoices and wires.

### INTERSTATE COMMERCE

146.     The Enterprise's activities affected interstate commerce and used the mails and wires in interstate commerce.

### PROXIMATE CAUSE AND INJURY TO BUSINESS OR PROPERTY

147.    As a direct and proximate result of the racketeering predicates, Plaintiffs suffered injury to business or property, including without limitation: (a) Sankoty Lodge Real Estate, LLC's overpayment for Spring Bay Materials at closing by at least approximately $2 million plus closing costs; (b) KDB Group, LLC's payment of falsely induced invoices and wires, including but not limited to the February 18, 2020 wire and subsequent payments; and (c) additional project costs traceable to the scheme's misstatements and concealments. For avoidance of doubt, Plaintiffs do not seek RICO damages for any uncalled guaranty obligations.

148.    The racketeering predicates—not any independent or intervening acts—directly caused the above injuries. The scheme's object was money and property, not merely the right to control information.

**PERSON/ENTERPRISE DISTINCTNESS**

149.    Each Defendant is a RICO 'person' distinct from the association  in  fact Enterprise. The Enterprise is not identical to any single Defendant and exists separate and apart from the racketeering acts.

**LIMITATIONS**

150.    Plaintiffs filed within four years of discovery of multiple injuries and also seek recovery for new and independent injuries (including wire payments) within the limitations period. Defendants' concealments—including withholding and misrepresenting material valuation and use  of  proceeds information and segregating communications through the Bank—tolled limitations under the fraudulent  concealment doctrine until discovery of the injuries described.

151.    Under 18 U.S.C. § 1964(c), Plaintiffs demand judgment against all RICO Defendants, jointly and severally, for threefold the damages sustained, plus costs and reasonable attorneys' fees, pre-judgment interest on the actual damages and such further relief as the Court

deems just and proper.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant the following relief:

A. Enter judgment in an amount that is three times actual damages proven at trial, together with costs attorneys' fees and pre-judgment interest.

B. Enter judgment for such other and further relief as the court finds is warranted.

### DEMAND FOR A TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues raised by the Complaint.

**SANKOTY LODGE REAL ESTATE, LLC, KIM BLICKENSTAFF, KDB GROUP, LLC, SPRING BAY LAND DEVELOPMENT, LLC, SANKOTY LODGE, LLC, KIM BLICKENSTAFF REVOCABLE TRUST**

By:\_\_\_\_\_/s/ Terrence Buehler_____
    One of their attorneys

James DiTommaso (6328466)
Peter S. Lubin(6185789)
Terrence Buehler, Of Counsel (6181738)
DiTommaso Lubin, P.C.
17W220 22nd Street, Suite 410
Oakbrook Terrace, Illinois 60181
(630) 333-0333
james@l-a.law
peter@l-a.law
tbuehler@tbuehlerlaw.com